## THE GERMAN N. BANK v. THE FARMERS' D. N. BANK.

ERROR TO THE COURT OF COMMON PLEAS NO. 1 OF ALLEGHENY COUNTY.

Argued October 31, 1887—Decided January 3, 1888.

The Germania Savings Bank drew and delivered to the Penn Bank a check on the German National Bank. The G. N. B. was a member of the clearing house; the P. B. was not, but was represented therein by The Farmers' Dep. National Bank. For the collection of said check through the clearing house, the P. B. indorsed it, "For deposit, Clearing House, May 26, 1884," and deposited it with the F. D. N. B., which at once sent it into the clearing house, where it received credit for the amount. The check was then sent in the usual course of business by the clearing house to the G. N. B., the drawee, where it was filed and journaled. The P. B. suspended the same day before 12 M. The G. S. B., the drawer, at once notified the G. N. B., the drawee, to stop payment. The G. N. B. at once canceled the journal entry, and returned the check to the F. D. N. B. before 1 P. M., and, having guaranteed the file-cut, was paid the amount thereof by the F. D. N. B., which received the check and charged it back to the P. B. Subsequently the F. D. N. B. brought suit against the G. N. B. to recover the amount of the check so returned to it: Held,

1. That the G. S. B., the drawer, had the right to notify the G. N. B., the

drawee, to stop payment of said check, and giving such notice, the F. D. N. B., the holder, having received it for collection only, had no right of action against the G. N. B., the drawee.

2. That the receipt, filing and journaling of the check by the G. N. B., the drawee, though perhaps constituting a conditional acceptance, was subject to the right, under the rules of the clearing house binding upon its members, to revoke such acceptance and return the check to the F. D. N. B. before 1 P. M.

Before GORDON, C. J., PAXSON, STERRETT, GREEN and WILLIAMS, JJ.; TRUNKEY and CLARK, JJ., absent.

No. 147 October Term 1887, Sup. Ct.; court below, No. 708 June Term 1885, C. P.

This was an action in assumpsit brought by the Farmers' Deposit National Bank against the German National Bank, the narr. wherein, in addition to the common counts, contained a special count, which after setting out that on May 26, 1884, the plaintiff presented to the defendant for payment a check dated May 24, 1884, drawn by the Germania Savings Bank upon the defendant to the order of the Penn Bank, for $20,000, which had been duly indorsed by the said Penn Bank, delivered to and held by the plaintiff, proceeded:

That the said defendant then and there and upon the day aforesaid, having in its possession sufficient funds of the said Germania Savings Bank to pay the said check to the said plaintiff, then and there received, accepted, paid and cancelled the same. That subsequently thereto, and upon the day and year aforesaid, the said defendant, at the instance of and for the purpose of enabling the Germania Savings Bank aforesaid to obtain some advantage in a settlement of accounts by it to be made with the Penn Bank, the payee of said check, returned the said check to the plaintiff, and alleged and averred that said check was not good and that said receipt, acceptance, payment and cancellation by it, the said defendant, had been done by its mistake, and procured the said plaintiff to repay to the said defendant the amount of the said check previously by it, the said defendant, paid to the said plaintiff as aforesaid, to wit, the sum of twenty thousand dollars; and thereupon and in consideration of the said payment by the said plaintiff upon the day aforesaid guaranteed to the said plaintiff that

such receipt, acceptance, payment and cancellation of said check had been previously made by it, the said defendant, by its mistake and inadvertence, and the defendant there promised and agreed to indemnify the said plaintiff from all loss by reason of the said repayment of the said money by the said plaintiff to the said defendant; and said defendant saith that said averment and allegation of said defendant was false, and that said check was good and drawn against funds of said Germania Savings Bank in the possession of said defendant and was in fact received, accepted, paid and cancelled by the said defendant before its return to plaintiff, and that the said receipt, acceptance, payment and cancellation was not by the mistake of defendant, as averred and alleged by it, but properly done by said defendant and with full knowledge on its part.

The rules of the Clearing House Association provide: " Errors in exchanges shall be adjusted by the banks concerned, and checks not good shall be returned to the bank depositing them, according to the regulations now in force, viz.: before one o'clock P. M. The association not to be responsible in any case."

At the trial, on May 13, 1887, the plaintiff offered in evidence a notice in writing from Henry Warner, assignee of the Penn Bank, to the Farmers' Deposit National Bank, that the two checks of the Germania Savings Bank, dated May 24, 1874, one on the German National Bank for $20,000 and one on the Third National Bank for $21,942.21, and deposited with it for collection, were improperly returned to it by the said banks respectively, after they had been paid, and he would expect the Farmers' Deposit National Bank to make good to him as assignee the amount of said two checks. Objected to as incompetent and irrelevant. Objection overruled, and evidence admitted.[1]

George R. Duncan, called for plaintiff, was asked on cross-examination: Q. You have stated that the placing of checks upon the file, whether they are received over the counter or through the clearing house, indicates an acceptance. Are there not two kinds of acceptances, a conditional acceptance of checks received through the clearing house subject to the

right to return within the hours fixed by the clearing house, and a final acceptance ? Objected to as not cross-examination. Objection overruled, and evidence admitted.[2] Q. Are there not, and can there not be, two kinds of acceptances, a conditional and an absolute acceptance? Objected to for the same reason. Objection overruled and evidence admitted.[3]

Robert Hyslop, called for defendant, testified that he had been engaged in the banking business for nineteen years, and was familiar with the customs and usages of banks in relation to checks under the Clearing House Association rules. Q. According to the custom of banks, state what, in your opinion, is the effect of a file-cut on a check sent through the clearing house and returned to the bank sending it before the hour allowed by the rules of the clearing house for the return of such checks had expired. Objected to, that the witness does not know the custom of banks in Pittsburgh. Objection sustained.[4]

The defendant proposed to prove by the witness that, according to the general custom and usage of banks and bankers, a file-cut in a check sent through the clearing house and returned to the bank sending the same before the hour fixed by the clearing house rules for the return of checks not good, indicates not an absolute acceptance but simply a conditional acceptance of the check, subject to the right of the bank on which it was drawn to return it any time before the expiration of the clearing house hours. Objected to as irrelevant and incompetent, and specially, as this witness has no knowledge of the custom in Pittsburgh, but is from New York city. Objection sustained.[5]

Charles Seibert, secretary and treasurer of the Germania Savings Bank, called for the defendant.

Defendant proposes to prove by the witness on the stand that on the 24th day of May, 1884, the Germania Savings Bank held a check of the Penn Bank for an amount in excess of the check now in litigation, which check was payable to the order of the Germania Savings Bank, and was by it indorsed and deposited with the Farmers' Deposit National Bank; and that on the 26th day of May, before the stoppage of the payment of this check now in dispute, the Farmers' Deposit National Bank returned that check to the Germania

Savings Bank with a demand that they repay to them the amount of the check and notice that the check had not been paid by the Penn Bank. This for the purpose of showing that the Germania Savings Bank has a defence to this check as against the Penn Bank.

Objected to, (1) because the testimony does not sustain the purpose of the offer; (2) incompetent and irrelevant. Objection sustained.[6]

The facts as developed in the testimony were as briefly stated in the syllabus and as more fully and sufficiently appear in the opinion of this court.

The court, STOWE, P. J., answered certain of the points presented and charged the jury as follows:

The plaintiff's counsel requests the court to charge:

1. The rules of the clearing house are for the benefit and protection of the bank on which the check is drawn, and not of the party drawing the check; and the rule giving until one o'clock to return checks not good, does not affect or extend the right of the drawer to revoke it or stop payment.

Answer: Affirmed.[15]

2. The right to stop payment by the drawer of the check cannot be exercised after the bank on which the check is drawn has accepted or paid the check, although the time for the return of a check under the clearing house rules has not expired.

Answer: Affirmed.[16]

5. If the defendant bank had paid the check in evidence, and afterwards presented it to the plaintiff bank and the defendant then represented and guaranteed to the plaintiff that the check had not been paid, and relying upon this the plaintiff paid the defendant the amount it had received credit for, by reason of said check in the clearing house, then the plaintiff may recover.

Answered: Affirmed.[17]

7. The uncontradicted testimony in this case showing that when defendant's messenger returned the check in suit to plaintiff bank he represented to plaintiff's teller that payment had been stopped upon said check, but if as a fact the check had then been actually paid, the plaintiff could recover on the

count for money had and received for the amount it actually paid to the German National Bank in redemption of said check.

Answer: Affirmed.[18]

Defendant's counsel respectfully ask the court to charge:

1. Under all the evidence in this case the verdict must be for the defendant.

Answer: Refused.[19]

In a controversy as to whether a check has been paid or not you have to look at what occurred at the time of the transaction. Ordinarily if you have no account in a bank and go there to collect a check you hand it over the counter. If it is all right, and the banker recognizes you as the proper party, he gives you the money and you go away with it. That of course ends the transaction as far as you are concerned. If you are doing business in the same bank and don't want the money, they take the check and do something with it, you don't know what exactly, but they give you a credit, and the ordinary practice is, as the evidence shows here, to put it on a file. I presume they generally have a triangular cutter as shown in this case. That cuts the check but it don't pay it, because even in a case of that kind, if the drawer of the check would go in and countermand the payment of it I presume he would have a right to do so, because the check has not been actually paid. [But it indicates upon the face of it the fact, if nothing else appears, that the check has been paid; it is a mutilation of it; it is doing that which, if the party didn't intend to pay the check at the time he had no right to do. You own the check and he has cut or mutilated it. He may have done it by mistake, and that, of course, is susceptible of correction, but the mere fact that the check is cut in that way, I think under the testimony in this case and under the general practice, indicates that it has been paid.][7] I say indicates, because there are certain reasons which would account for it being done, without showing payment. That being the case, if a check is presented at a bank and it bears upon its face that which indicates it has been paid, the party who redeems it has to do so at his own risk, and if it turns out it has been paid before, and either he or somebody else is to lose the

money, the law would cast the loss on him, and the reason is that he is bound to take reasonable and proper care in examining checks before paying them.

I draw a check and tear it to pieces. Some one picks it up and pastes it together, takes it to my banker; he looks at it, sees it is defaced, that it bears suspicious marks; it don't seem to have and does not have the appearance a check ought to have; he can see it has been torn up and pasted together. He may pay that check if he chooses, but if he pays it I am not necessarily responsible if it should turn out that I had torn the check up to destroy it, and he paid it without making proper inquiry. I have no doubt as a mere matter of law, without more, he would be guilty of negligence, and although he had paid the check he could not charge me with it from the fact he had paid it when he had no right to do so. The case would be much stronger if a check were presented with the word "paid" written across it. I might give a man a check, and the next day meet him on the street and pay him the money, take the check back and write the word "paid" across the face of it and afterwards lose it, and if it were found and presented to a banker and he would pay it, common sense would indicate that he did it at his own risk, and he could not recover the amount of it off me, because it was through his own carelessness and negligence that it was paid.

That bears on this case in this way: [We have in evidence that the cut in this check, presented or taken back to the Farmers' Bank after it had gone into the German Bank, bore on it that which impressed it with payment, indicated to bankers that it had been paid, that there was something wrong about it. When the check was brought back by the messenger of the German Bank to the Farmers' Bank and presented for redemption, the teller saw on it that which, if written out in plain letters, would read "p-a-i-d."][8] [He refused to take it back. He would not take it until the German Bank, through its messenger, was put in a position that if there was anything wrong about the cut, which indicated payment, or in the assertion which the cut made that it was paid, anything wrong in the allegation that it was not paid that the messenger made at the time he brought the check to the Farmers' Bank, then the defendant would stand over it,

and make it good. The bank which gets the money upon a check which it has no right to have the money for, has obtained it under a false representation, which of itself, without any guarantee, it seems to me, would make the bank responsible. ][12]

The plaintiff refused to take this check back until it was marked " Cut guaranteed," and we must direct our attention to the signification of these words. I must say that I have been, if not instructed, considerably surprised, with the views the different gentlemen connected with banking operations in this city expressed with reference to the signification of that peculiar term. If it were plain English we would have to instruct you as a matter of law what the words meant, and the expression of opinion of anybody else would amount to nothing. Taken by themselves the words do not mean anything, or at least nobody can tell what they mean. These gentlemen, or some of them, don't seem to understand what they mean, or if they do, they seem to understand it so well that they cannot explain it. They all have one idea, it seems to me, running through the whole testimony, and that is that putting these words on the check makes the bank that puts them there responsible as though the cut had never been made ; that the bank means to say that that cut was made and it don't mean what it seems to have meant when put there ; that it seems to mean payment, and yet don't mean payment. It seems to me there is very little difference of opinion, and when the idea is stated closely and tersely it is that the bank that wrote those words on the check meant to say that that check was to be as if the cut had not been made, and if it turns out that by reason of the cut a responsibility arises to the party who takes the check back the·bank cutting it will make it good. The word " guarantee " means something. The act of cutting means something, and this talk about the words guaranteeing the fact that somebody made a hole in the check, which is obvious, and if the bank holding it came around they would show how they made it, or who made it, is simply an absurdity. That the words involve some sort of liability is beyond peradventure. What it is, while I have a very clear and distinct idea of my own, I must, of course, refer to the jury. It is a question for you to determine under

Charge of Court below.

all the evidence. [ If you think, in view of the testimony, that the words mean a liability which required the German Bank to make good any loss that might arise to the plaintiff by reason of that check having been paid, when it represented it had not been paid, the plaintiff has made out a case that will justify a recovery.] [14] If it had been paid at that time, actually and in fact, by the German Bank, the plaintiff has a right to recover the full amount of it.

Assuming for the present you will find that the words on this check " Cut guaranteed" meant a guarantee or representation on the part of the defendant that they would make the check good in case any trouble should arise by reason of having paid it, when it was represented not to have been paid, we come next to the question, was it actually paid? Upon that the chief argument has been made by counsel. You have heard the testimony as to the manner in which business was done by the clearing house, that all these banks, under the rules of the clearing house have until one o'clock to see whether they will accept a check or not. [You have it in evidence that where a banker receives a check, puts it upon the file, makes no objection to it, it is prima facie evidence of payment. Without the jury would say there was a mistake, they are bound to presume that it was received as actual payment, and that, too, whether the banker had a right, as he might have had, to delay the acceptance of it or not.] [9] If I go into a bank with a check they are not bound to accept it. They may say they don't know about it, want to inquire about the standing of the bank it is drawn upon, or the standing of the drawer. If they give me the money the act is consummated, and if anybody should then come in and try to stop payment it would be too late, although I might have stolen the check. The party from whom I got it would have to look to me, and the bank would be protected. Where money has been paid there can be no equivocation or qualification of the act. You may call it what you please, but it is payment, and no theory and no testimony under the sun would make it anything else. It might be payment under mistake, might be payment of a fraudulent check, but it is payment, and it is a payment which, if the drawer has money in the bank, and the check is genuine, cannot be gone behind

so far as the maker of it is concerned and the banker. But sometimes the act is more equivocal, even where you hand the check over the counter. There is no money immediately paid. You go in, lay your check down, and walk out. You don't even stop to see what the banker does, but he puts the check on the file and gives you a credit in the books. After you have gone out if the drawer should go in and stop, or undertake to stop the payment of the check, and the banker, for certain reasons, should feel disposed to assume it had not been paid, it is too late; he has paid it.

[Where a check upon a bank, is presented to it by the holder for deposit to his credit, and the amount is credited to the holder, the legal effect is precisely the same as though the money was first paid out to him, and then by him deposited in the bank. It is the right of the bank to refuse to pay it, or it may reject it conditionally. . But if it accepts the check as valid and pays out the money, or what as some authorities hold, is the same thing, credits it to the holder's account, it cannot at any time thereafter, even on the same day, return the check on discovering that there were no funds to meet it, and cancel the transaction, for the collection is then treated as accomplished: Daniels, Neg. Inst., 1621.][13]

This being the state of the law, as we understand it with reference to this transaction, you come directly to what occurred at the time this check went into the defendant bank. It came through the clearing house. According to the rules of the clearing house, not affected by the fact that settlement had to be made between the banks before that, and the check was in fact, as between the banks, paid, which did not affect the right to return the check if the defendant bank had proper cause and did it at the proper time, the defendant had until one o'clock to return the check. The fact that the check was good when it went in will not hold the defendant bank liable for anything that transpired before one o'clock which made it bad. If there were ten times the amount of money necessary to pay it, or if they considered it good, say up until twelve o'clock, because the money was there and they had heard nothing to the contrary, yet if at half past twelve, the time the Penn Bank failed, to bring it down directly to this case, the defendant received notice from the Germania Bank, they

had a right to say they would not pay it and return it to the Farmers' Deposit Bank and demand restitution, but that right depends on one thing, and that is on the fact of the actual acceptance of this check previously. [The defendant had until one o'clock to accept it, and did it absolutely and unconditionally accept the check before that time? The mark on the face of it, the entries on the books, would indicate it did.] [10] The testimony of the officers as to their actual intent at the time, so far as they had any intent, and as to the ordinary practice of the bank, is that they did not intend to, and did not in fact pay it; that because this was a check coming from the clearing house they in this case, as in all others, whatever they may have done with the check in the meantime, received it merely conditionally and accepted it conditionally; that it became necessary to make certain entries with reference to it because of the necessity of doing their bookkeeping in banking hours, for if they put off making them until after one o'clock, with the large amount of checks that came from the clearing house, they could not possibly get their business crowded into the business hours of the day ; that therefore they commenced treating checks as though they had accepted them, at the same time the acceptance being merely on the condition that nothing would occur before the hour that they could return them, and, keeping them in that shape, they always reserved and intended to reserve the right to return checks in case it turned out they were not good, up to the hour limited. If you find that to be the fact I instruct you your verdict must be for the defendant. If you find in reference to the guarantee that the defendant simply guaranteed there was a hole in the check, or that the guarantee meant something else, nobody could tell what, you find for the defendant. But if you think it meant something, and that something was a responsibility on the part of the defendant bank to make good this check that had been paid, when it was represented not to be paid, the question is was it paid—paid to all intents and purposes by the understanding and acts of the defendant.

[On the one hand you have the acts, you have standing alone the cut, the check put upon a file, which ordinarily indicates payment, and you have entries on the books giving credit to the parties entitled to receive it; and without any explana-

tion, those facts, it would seem to me, would indicate beyond peradventure that the defendant bank had fixed itself, and in the language of the law as I read it to you, that constituted such a payment that the defendant could not have gotten out of it, even if they afterwards discovered they hadn't the money to pay the check.] [11]

But that is only one side of the case; that is the presumption that arises from these facts.   You have on the other side the evidence that these gentlemen, and others connected with this Clearing House Association, understand that they have always up to one o'clock to accept absolutely or not; sometimes they put them on separate files—I don't know whether it transpired in this case but it did before—or do not put them on any files.   Sometimes they do one thing and sometimes another.   In this case, whatever they may do elsewhere, they say that their putting this check on the file was nothing more than a conditional acceptance and the entries on the books were merely to save time; that these acts were not intended to hold them absolutely responsible, and if you so find, of course your verdict ought to be for the defendant.

The case, gentlemen, is one depending entirely upon the facts, and you are to decide it according to your best judgment.

The jury rendered a verdict for the plaintiff for $20,080, and judgment being entered thereon, the defendant took this writ, assigning for error:

1. The admission of plaintiff's offer. [1]
2, 3. The sustaining of plaintiff's objections. [2][3]
4–6. The sustaining of plaintiff's objections. [4][5][6]
7–14. The parts of the charge embraced in [ ] [7 to 14]
15–18. The answers to the plaintiff's points. [15 to 18]
19. The answer to the defendant's point. [19]

*Mr. John Dalzell* and *Mr. Geo. W. Guthrie* (with them *Mr. Jacob F. Slagle,* and *Kennedy & Doty*), for the plaintiff in error:

1. The only evidence relied on by the plaintiff to prove acceptance and payment of the check was that before 1 P. M., the day it was received from the clearing house, it was put on

a file and entered on the journal, and testimony that when a check is presented over the counter and paid it is put on the file, and that therefore a file-cut indicates payment. This was completely rebutted by the defendant's testimony that a file-cut under the circumstances simply indicated a conditional acceptance, subject to the right of the bank to return it for any reason before 1 P. M. The court erred in peremptorily charging that the file-cut was "prima facie evidence of payment;" that unless they "would say there was a mistake, they were bound to presume that it was received in actual payment," in entire disregard of the defendant's evidence. Money paid on a check under a mistake as to the drawer's account may be recovered: Meredith v. Haines, 14 W. N. 364. While the legal effect of a custom is for the court, its existence is a question of fact for the jury: Lewis v. Marshall, 7 Man. & G. 729. But, as to the file-cut, the real question was, what was the intention of the defendant's officers? A party charged with the commission of an act with a particular intent, may testify what that intention was: Cake v. Pottsville Bank, 116 Pa. 264; McGrann v. Railroad Co., 111 Pa. 171; Dwight v. Whitney, 15 Pick. 179. The testimony of the four officers, uncontradicted and unimpeached, as to this intent, was erroneously permitted by the court to be entirely disregarded by the jury: Mead v. Conroe, 113 Pa. 220.

2. Even if the check was put upon the file and entered upon the journal, with a definite and final intention of accepting it, yet such action not having been communicated to or known by the plaintiff, defendant had the right to rescind it and to return the check before 1 P. M. A holder cannot maintain an action on a check against the drawee, unless it has been accepted: Saylor v. Bushong, 100 Pa. 23; Carr v. Bank, 107 Mass. 45; Bank v. Millard, 10 Wall. 152; Bank v. Whitman, 94 U. S. 343. An acceptance may be cancelled or revoked before the acceptance has been communicated: Chit. Bills, § 308, 309; Merchants' N. Bank v. N. Eagle Bank, 101 Mass. 281; Overman v. Hoboken City Bank, 2 Vr. 563; Byles Bills, § 189; Raper v. Berbeck, 15 East 17; Cox v. Troy, 5 B. & A. 474; Fernandey v. Glynn, 1 Camp. 426; Wilkinson v. Johnson, 3 B. & C. 428; or within the time allowed by the clearing house rules for the return of the check: Warwick v. Rogers,

5 Man. & G. 340 (on all fours with our case); Prince v. Oriental Bank, L. R. 3 App. C. 325; Rockville Bank v. Lafayette Bank, 69 Ind. 479; Colorado Bank v. Boettcher, 5 Col. 185; First N. B. v. Higbee, 109 Pa. 130; Simpson v. Ingham, 2 B. & C. 65. An offer is never binding until accepted, and an acceptance is never binding until communicated: Langdell L. C. Cont., 1–169; Mactier v. Frith, 1 Paige 442. Northumberland Bank v. McMichael, 106 Pa. 460, is not in conflict with these rules and is inapplicable.

3. It was error in the court below to instruct the jury, that if they found that the defendant had paid the check before it was returned, then the money repaid on it was obtained " under false representations," and that plaintiff was entitled to recover. (1) There was no evidence of any misrepresentation. The representation that payment was stopped, was true. The return of the check may have been an assertion of defendant's right to have it redeemed, but, if so, it was an asser´tion of a legal right. A misrepresentation of a matter of law does not constitute fraud: Kerr F. & M., 90; Big. F., 8; Lewis v. Jones, 4 B. & C. 506; Blackburn's Case, 8 D. M. & G. 177; Rashdall v. Ford, L. R. 2 Eq. 750; Beattie v. Ebury, 41 L. I. Ch. 304; Upton v. Tribilcock, 91 U. S. 45; and representations made in good faith, though erroneous, constitute no ground of action: Huber v. Wilson, 23 Pa. 178; Graham v. Hollinger, 46 Pa. 55; Dilworth v. Bradner, 85 Pa. 238. The evidence disclosed not a case of money obtained by misrepresentation or false pretense, but of a voluntary payment made under a claim of right, and such a payment cannot be recovered back: Real Estate Savings Inst. v. Linder, 74 Pa. 371; McCrickhart v. Pittsburgh, 88 Pa. 133. (2) The payment was made upon the indorsement, " Cut guaranteed;" not upon representations. There can be no implied agreement when the parties themselves have made an express one, upon which they see fit to act: Toussaint v. Martinnant, 2 D. & E. 100; Crafts v. Tritton, 8 Taunt. 365; Duncan v. Keiffer, 3 Binn. 126; Chit. Con., 11 Am. ed. 89; Brandt Sur., § 176; Whiting v. Sullivan, 7 Mass. 107; Anth v. Nickols, 37 Conn. 375; Voorhees v. Combs, 4 Vr. 494; Barry v. Ryan, 4 Gray 523.

4. Observe, that the plaintiff has not yet suffered any loss.

The real parties in interest are the Penn Bank and the Germania Savings Bank. The plaintiff here was but the agent of the Penn Bank. The measure of the plaintiff's damage is the actual loss it has suffered: Dan. Neg. Inst., 329; Story Agency, 236; First N. Bank v.. First National Bank, 77 N. Y. 329; Borup v. Nininger, 5 Minn. 523; VanWart v. Wooley, 3 B. & C. 204.

*Mr. D. T. Watson* (with whom were *Knox & Reed*), for the defendant in error:

1. The case went to the jury on questions of fact. Did the defendant bank really and truly intend by its acts on May 26, 1884, to finally accept and pay this check? If it did not, the jury were told the plaintiff could not recover. If it did, then the further question was left as to the meaning of "Cut guaranteed." Everything was ruled in favor of, not against, the defendant; and when the jury found as it did that the defendant really intended absolutely to pay the check and waived all right to return it to the plaintiff under the clearing house rules, everything was established which even the defendant claimed was necessary to show payment.

It was a question of fact for the jury as to whether the defendant did accept and pay the check: Northumberland Bank v. McMichael, 106 Pa. 463; even if the plaintiff relied merely on a presumption: Penn. R. Co. v. Miller, 87 Pa. 395.

2. A customer of a bank may countermand payment of a check before it is paid. But he has no right to recall the check after it has been paid to one who took it in good faith, and for value, nor can his banker do so for him. "If the banker receives the check, pays the money or its equivalent to the holder, cancels and charges up the check to the maker, such acts must be regarded as payment, and this payment cannot be rescinded without the consent of the person to whom payment was made:" Albers v. Commercial Bank, 85 Mo. 173. Warwick v. Rogers is to be distinguished in that, in the case at bar, the check was payable when presented; there was no mistake and the jury found payment was intended, and the defendant paid the check by paying its balance into the clearing house: Oddie v. Bank, 45 N. Y. 741; Dan. Neg. Inst., § 1621.

3. The rule of the clearing house permits the return of checks "not good" before 1 P. M. "Not-good" is something connected with the check and some reason personal to the returning bank. It could not enable the drawee of a check which had been paid, after the payment to cancel the payment and return the check under the plea that payment was stopped, without the consent of the payee or indorsee who has received the money and is interested. The legal meaning of "not good" is "account overdrawn": Tradesmen's Bank v. Third N. Bank, 66 Pa. 439.

4. The assertion that payment had been stopped, when it was not, was not a false representation of a matter of law, but of a matter of fact. If the check had been paid, there was a deceit, for which an action would lie ; or, the tort might be waived and a recovery had under the count for money had and received: Hellings v. Hamilton, 4 W. & S. 462; Mathers v. Pearson, 13 S. & R. 258. But when this assertion was made the defendant indorsed on the check, "Cut guaranteed," which meant as witnesses said, "we agree to make this check as if it had not been cut."

5. Actual damage was shown. Under the misrepresentation, the plaintiff paid the defendant $20,000, to which it had no legal right. Is not the plaintiff out this $20,000? Can the defendant claim that in order to save it, the plaintiff must go into litigation with the Penn Bank to prove that plaintiff properly charged back the check?

OPINION, MR. JUSTICE PAXSON:

A statement of the facts is essential to an understanding of this case. They are substantially as follows : On May 24, 1884, the Germania Savings Bank drew and delivered to the Penn Bank a check on the German National Bank for $20,000. The Farmers' Deposit National Bank and the German National Bank were members of the clearing house. The Penn Bank was not, but was represented therein by the Farmers' Deposit National Bank as its agent. For the purpose of collecting said check through the clearing house, the Penn Bank indorsed it: "For deposit, Clearing House, May 26, 1884; Penn Bank, Pittsburgh, C. F. M'Combs, A. Teller," and deposited it with the Farmers' Deposit National Bank. The

check was sent through the clearing house on May 26th in the usual manner, and the Farmers' Deposit National received credit at the clearing house for the amount thereof. The check was then sent in the usual course of business to the German National Bank upon which it was drawn, where the envelope containing it was opened by C. Van Buren, Jr., for the teller, who examined it, and placed it upon file. Shortly after this, John E. Wessler, the assistant teller, took it off the file, and entered it in the journal, but it was not then, nor has it ever been, posted in the ledger. This was on May 26th. On the same day the Penn Bank failed, and closed its doors a little after twelve o'clock. The Germania Savings Bank hearing of this, and having, it is alleged, a defence to the check as against the Penn Bank, immediately notified the German National Bank to stop payment. On receipt of this notice, the German National Bank cancelled the entry on its journal, and handed the check to its messenger, with instructions to return it to the Farmers' Deposit National Bank, where it was presented before one o'clock, with the information that payment had been stopped, and a demand was made upon the latter bank for the money. The messenger was requested by the teller of the latter bank to guarantee the cut (made by the file), whereupon the messenger wrote on the back of the check the words: " Cut guaranteed, O. C. Bergdorf, messenger." Whereupon the check was accepted, charged back to the account of the Penn Bank, and a teller's check for the amount given to the German National Bank, which was duly paid through the clearing house next day. The Farmers' Deposit National Bank held the check, as already stated, for the mere purpose of collection, as agent of the Penn Bank. There is nothing in the case to show if it ever asked the German National Bank whether it had accepted it, or would accept it; that it had any knowledge that the check had been on file (except what the cut would imply), or entered upon any book of the German National Bank; nor that it was induced to give credit or change its position in any way by any action taken by said bank. The Penn Bank never resumed business, and, on May 28th, made an assignment to Henry Warner, who sometime afterward notified the Farmers' Deposit National Bank that he held it responsible for the amount of the check.

The Clearing House Association is not responsible for anything except the proper distribution of the money paid to settle balances, its purpose being to provide a convenient place where checks may be presented and balances adjusted. Its rules provide : " Errors in the exchanges shall be adjusted by the banks, and checks not good shall be returned to the bank depositing them, according to the regulations now in force, viz. : before one o'clock P. M. The association not to be responsible in any case."

The course of business in the clearing house, as I gather it from the uncontradicted evidence, is as follows :

The association is composed of nineteen different banks. At half-past nine each morning, each bank sends a clerk and a messenger to the clearing house with all the checks received by it on the previous day on the other banks, the checks on each particular bank being placed in a separate envelope. The checks are then examined, and a balance struck. If a bank is a debtor bank, it is required to pay the amount of its indebtedness to the clearing house before 11:30 of the same day in money. If a creditor bank, it receives its balance from the clearing house from half-past eleven to twelve o'clock. When the checks are assorted, all the checks on any one bank are placed in an envelope and handed to the clerk or messenger of that bank, with a memorandum, stating whether it is a creditor or a debtor bank, and the amount of such debit or credit. If a debtor, this bank then makes up a package of money, corresponding with the amount it owes, and sends it to the clearing house before 11:30 A. M. as before stated. If a creditor, it sends to the same place before 12 o'clock and gets its money. When the checks are returned by the clearing house to the banks upon which they are respectively drawn, the latter have until one o'clock in which to correct mistakes. If there are no funds to meet a particular check; if payment has been stopped, or if from any reason the bank declines to pay it, the rule of the clearing house above cited, and the practice under it allows the bank until one o'clock to return it to the bank from whence it came. If not returned before that hour, the bank is fixed absolutely for the check. There appears to be no uniform practice on the part of the banks composing the Clearing House Association as to the time of entering

on their books the checks received from said association. Some defer entering them until after one o'clock, when the time for the correction of errors has passed. Others place them on file, and enter them immediately. This was done by the German National Bank, defendant, with the check in question. It was put on the file, a spear-shaped instrument, which makes a cut in the check, and was then entered in the journal, but it was not carried forward to the ledger. The officers of the bank, however, testified that this was done for the convenient transaction of its business; that to defer all such entries until after one o'clock would prevent the bank getting through its business during banking hours; that the placing it on file, and entering it on the journal was only a conditional acceptance, subject to be revoked for cause at any time before one o'clock. As to the right of a bank to return a check before one o'clock received from the clearing house, there can be no question. The evidence upon this point was overwhelming, and I believe uncontradicted.

Under these circumstances what are the legal rights of the parties to this suit? As before observed, the Farmers' Deposit National Bank, plaintiff below, had no interest in this check. It was merely the agent for collection of the Penn Bank. When the check was returned to it from the defendant bank, and it was notified that payment had been stopped, it received said check, and gave that bank a teller's check for the amount. It gave the latter check for the reason, I presume, that it had received a credit therefor that morning at the clearing house. It then charged the check in question back to the Penn Bank, and sent the check itself to that bank. The surrender of the check was voluntary, and there is no evidence that it was procured by any fraud or misrepresentation on the part of the German National Bank. Under these circumstances I am unable to see what claim the plaintiff bank has upon the latter. It has no interest in the check or the money which it represents. It is not a dollar out of pocket, and a recovery in this suit would add $20,000 to its assets, for which it paid nothing, unless, as I assume to be the case, this suit is for the benefit of the Penn Bank. This would enable the latter to do indirectly what it could not do directly, viz.: to avoid a contest with the drawer of the check and recover,

or at least attempt to recover, from the drawee. It is the voice of Jacob, but it is the hand of Esau.

As I understand the case there are but two principles involved, viz.: (*a*) had the Germania Savings Bank the right to stop payment on the check, and (*b*) if so, was the right exercised in time, that is to say, before actual payment? All other material questions in the case are but subdivisions of these.

I presume no one at this day questions the right of the drawer of a check to stop the payment thereof. This is usually done by notice to the bank upon which the check is drawn. If the bank pay after such notice it does so at its peril. The holder of a check has no remedy against a bank upon which a check is drawn for its refusal to pay it. He must look to the drawer. The right to stop payment ceases of course with actual payment.

The case then narrows itself down to the single point, was the check paid when notice was given the German National Bank not to pay it? The plaintiff contends that it was, and points to the "cut" on the check and the entry in the journal of the German National Bank as evidence of that fact. We may say just here that a vast amount of time was wasted on the trial in the court below over the meaning of the words "Cut guaranteed." They are of little importance in our view of the case. This is not a suit upon the guaranty, and its meaning is only indirectly involved. The existence of the "cut" was a circumstance that had some bearing, as it showed in connection with other testimony that the check had been on a file where paid checks are usually placed. But there is no magic in a file-cut or in an entry in a journal. Both required explanation and that was fully given. The "cut" and the entry on the journal, if the uncontradicted evidence is to be believed, were made for the convenience of the defendant bank. Together they perhaps constituted a conditional acceptance of the check, subject to the right of the bank under the rules of the clearing house to revoke it and return the check before one o'clock. It cannot be seriously questioned that had the defendant bank pigeon-holed the check instead of placing it on file, it would have had the right to return it before one o'clock. And can it make any difference that for its

own convenience and to expedite business it entered the check from the clearing house as soon as received ? It had until one o'clock to correct any errors, and I am unable to see upon what principle or what reason the plaintiff bank could have refused to receive the check, with the " Cut guaranteed," when offered at any time before that hour.

It may be that had the check been passed over the counter, or received by the defendant bank outside of the clearing house, the rulings of the court below would have been adequate. But we do not think sufficient weight was given to the regulations of the clearing house. As between it and its associated banks its rules have the force of law. It is a law to them because they have made it so. One plain object of the rule in question was to give the banks until one o'clock to correct any mistakes, and return checks that for any reason they declined to pay. The clearing house could not exist for a week without some such regulation. And in the face of this rule, the placing of a check on file and even entering it on the journal is not per se payment. It becomes so after one o'clock, if the check is not returned to the bank depositing it before that hour. This is the plain construction of the rule, and the court below would have been justified in nonsuiting the plaintiff at the close of its case.

There are nineteen assignments of error. I have preferred to discuss the principles involved instead of taking up the assignments, seriatim. All of them are sustained except the fourth, fifth and sixth.

Judgment reversed.